**O. Gaynor JANES, Appellant,**

v.

**CPR CORPORATION, Halifax Corporation and Richard Olivere, Appellees.**

**No. 17733.**

Court of Appeals of Texas, Houston (1st Dist.)

Sept. 3, 1981.
Rehearing Denied Sept. 18, 1981.

J. Julian Moore, Houston, for appellant.

Ronald E. Tigner, Patricia Hair, Baker & Botts, Wendell S. Loomis, Houston, for appellees.

Before COLEMAN, C. J., and PEDEN and SMITH, JJ.

COLEMAN, Chief Justice.

This is an appeal from a judgment rendered on a directed verdict against the plaintiff, O. Gaynor Janes, and in favor of the defendants CPR Corporation, Halifax Corporation, and Richard Olivere in a suit growing out of the foreclosure of a deed of trust on a certain tract of land located in Brazoria County, Texas. Judgment was rendered in favor of Halifax Corporation in its cross-action for the amount remaining due on a promissory note executed by O. Gaynor Janes as part of the purchase price of said property. Other parties named in the suit were disposed of by the judgment but no complaint is made of this action. The judgment will be affirmed in part and in part reversed and remanded.

In June of 1968, Janes, Jarvis Ferrell and Darwin Ferrell, as joint venturers, purchased from Jamaica Resort Corporation approximately 2.34 acres out of Block A, Treasure Island Subdivision, Brazoria County, Texas. Janes testified that he desired to invest some money and inquired of Bob McKennery, an insurance agent with whom he was acquainted, as to whether or not he knew of a good real estate investment. Subsequently, the insurance agent approached defendant Richard Olivere and told him that he knew some people who wanted to buy land. Mr. Olivere, in his capacity as a broker, had previously engaged in real estate transactions with the Jamaica Resort Corporation. This corporation was in the business of developing and selling land and had developed a number of resort areas. Mrs. Olivere was the owner of a 50% interest in the Grantwood Realty Corporation. Mr. Howard Bannister was an investor who had been in several deals with Mr. Olivere. At some time, apparently after the transaction in question, Mr. Bannister became the president of Grantwood Realty.

According to Mr. Olivere, some time prior to May 31, 1968, he secured permission from Jamaica Resort Corporation to sell a tract of land consisting of approximately 2.34 acres out of Block A, Treasure Island Subdivision, Brazoria County, Texas. On May 31, 1968, he sold this tract of land to Howard Bannister, who purchased it as an investment. He received a commission in this transaction. A short time thereafter Bob McKennery, the insurance agent acting for Dr. Janes, came to Mr. Olivere and told him that he had investors that were looking for investments, and asked if he had any. Mr. McKennery had had previous dealings with Mr. Olivere. Mr. Olivere suggested the 2.34 acre tract which he had sold to Mr. Bannister. Mr. McKennery then worked out a deal with Dr. Janes, Jarvis Ferrell, and his brother Darwin, whereby Dr. Janes and the Ferrell brothers would purchase the tract of land. Mr. Olivere then arranged for Mr. Bannister to reconvey the property to Jamaica Resort. Jamaica Resort then sold the property to Dr. Janes and the Ferrell brothers at an increased price and gave Mr. Bannister a note for the difference in the price which he had agreed to pay and the price at which it was sold to Dr. Janes and the Ferrell brothers. Mr. Olivere testified that he received a commission on this sale and that Grantwood Realty had an interest in the transaction. Mr. Olivere and Mr. McKennery agreed that the payments on the purchase money note would be made by Doctor Janes, who would have a one-half interest, and the Ferrell brothers to Grantwood Realty, who would in turn transmit

the money to the Jamaica Resort Corporation. Doctor Janes did not discuss the transaction with Mr. Olivere at any time prior to the sale; did not inspect the property; and did not know the Ferrell brothers. He relied totally on Mr. McKennery. Mr. Olivere never discussed the transaction with the Ferrell brothers either. The promissory note given as part of the consideration for the purchase was dated June 10, 1968, and was in the sum of $45,500. It was payable to Jamaica Resort Corporation.

Doctor Janes paid one-half of the installments coming due under the note to Grantwood Realty until September of 1972. His payments amounted to a sum in excess of $16,000. The Ferrell brothers made their payments for a period of time, but discontinued making their payments to Grantwood Realty some time prior to September 1971. In September of 1971, Grantwood Realty stopped forwarding the payments to Jamaica Resort. Mr. Olivere testified that Jamaica Resort owed Grantwood Realty Corporation the sum of $9,850, evidenced by a promissory note, and owed him personally the sum of $20,250, which was also represented by a promissory note, and was collected for him by Grantwood Realty. He testified that at the time Grantwood Realty discontinued forwarding Dr. Janes' payments a question had arisen as to how Jamaica Resort, or Timewealth Corporation, the new name for Jamaica Resort would make payments due on the notes executed by them to Grantwood Realty. Subsequently, it appeared that the Janes-Ferrell note was acquired by Crane Maier and Associates. Crane Maier would not allow the credits that were due from Jamaica Resort to Grantwood Realty and in July of 1971, Grantwood Realty paid some $8,000 to Crane Maier, bringing the payments on the Janes-Ferrell note current. In October of 1971, the Timewealth Corporation attempted a reorganization under federal law. This attempt was unsuccessful and Timewealth was forced into bankruptcy. At that time it had reacquired the Janes-Ferrell note. No payments were made on the note after Dr. Janes discontinued his payments.

In 1972, the Halifax Corporation was formed and purchased some of the assets of the Timewealth Corporation from the trustee in bankruptcy. The Janes-Ferrell note was one of these assets. In September of 1972, Halifax notified Olivere that the note was in default. In January of 1973, Halifax notified Janes of the default. During this period of time Olivere and Janes got together and entered into an agreement whereby Olivere would arrange to purchase the Ferrells' interest in the property. Olivere got in touch with the Halifax Corporation and arranged to re-finance the Janes-Ferrell promissory note on the consideration of paying $2,000 in delinquent interest. The new note, to be signed by Olivere and Dr. Janes, would be in the principal sum of $24,000. Olivere learned that the Ferrell brothers' interest had been transferred by foreclosure to the CPR Division of the Upjohn Company. He arranged to purchase their interest for the sum of $750. The written agreement between Olivere, Janes, and the Halifax Corporation setting out the conditions on which the Halifax Corporation agreed to rearrange and extend the time of payment of the Janes-Ferrell note required the payment of $2,000 cash to be applied against accrued and unpaid interest on the original note; the execution of a renewal and extension agreement verifying and confirming the vendor's lien and deed of trust securing payment of the original note; and the delivery of a mortgagee's title policy to Halifax, at the expense of Janes and Olivere, insuring the lien on the property given as security for the note. It provided that the agreement had to be signed by the parties and the $2,000 interest payment made before five o'clock p. m. on Monday, April 30, 1973, and that the pending foreclosure sale would be postponed until June 5, 1973.

The agreement was signed and Mr. Olivere put up the required $2,000 interest payment. Mr. Olivere also paid CPR Division $750 and received a deed which was deposited with the Brazoria County Abstract Company, the company designated to close the transaction. The Halifax Corporation agreed to waive its right to foreclose

on June 5, 1973. The parties agreed to close the transaction at the abstract company offices on July 31, 1973. Olivere appeared at the office of the abstract company on that date, but Janes did not appear. Olivere signed the instruments required of him and paid one-half of the closing costs. On August 3, Janes, accompanied by his attorney, went to the office prepared to close the transaction. Dr. Janes' attorney checked the abstract company's file and determined that the title company had required a corporate resolution confirming the authority of the CPR official, who had signed the deed, to convey its interest in the property and that it was not available. Dr. Janes signed the required documents, but on the advice of his attorney did not deposit any money for closing costs. Subsequently, a dispute arose between Dr. Janes and Mr. Olivere as to whether or not Dr. Janes was required to pay half of the $2,000 interest payment and half of the payment to CPR. The refinancing agreement was never consumated.

Halifax issued a letter indicating that the parties had until August 13, 1973, to complete the closing. This date passed. There is testimony by the attorney who represented Dr. Janes that he talked with the attorney for CPR concerning the corporate resolution on several occasions and that ultimately this attorney told him that it was too much trouble to get the correct documentation. This witness further testified that he received a letter from the attorney for Halifax Corporation stating that if the agreement was not consumated by August 13, 1973, the agreement to renegotiate would be cancelled. He also testified that he received a letter, dated August 14, which stated that the Halifax Corporation would foreclose on the property on September 4, 1973. Dr. Janes' attorney testified that he then negotiated an agreement with the attorney for Halifax postponing the September foreclosure and agreeing that Halifax would not foreclose until Dr. Janes received specific notice in writing of a subsequent foreclosure date. He also testified that he was told that there would be no foreclosure until he secured the "Upjohn documents."

He does not contend that these agreements were in writing.

Dr. Janes has appealed from the directed verdict in favor of the Halifax Corporation, the directed verdict in favor of Olivere and the directed verdict in favor of CPR Division of the Upjohn Company. We first consider the appeal as it relates to the Halifax Corporation's cause of action.

### Halifax Corporation

After a jury had been selected to try this case and during the opening statement of Dr. Janes' attorney, the attorney for Halifax Corporation made an objection on the ground that Dr. Janes had not alleged a cause of action for damages against Halifax Corporation based on wrongful foreclosure. Dr. Janes' attorney agreed not to go into that matter in his opening statement and continued. At the lunch break on the first day of the trial the plaintiff made an oral motion for a trial amendment consisting of amending paragraph nine of plaintiff's third amended original petition to add the words "and Halifax."

The effect of such an amendment would be to seek the sum of $50,000 as damages against the Halifax Corporation for wrongful foreclosure. The trial court denied this trial amendment and thereafter denied two additional motions for a trial amendment designed to assert a specific claim for damages against Halifax Corporation on the theory of wrongful foreclosure.

Rule 66, Texas Rules of Civil Procedure, which allows for amendments of pleading at the time of the trial, contemplates that unless the objecting party shows that he would be prejudiced by the trial amendment, it shall be granted. *Century Rental Equipment, Inc. v. Neo-Flasher Mfg. Co.,* 378 S.W.2d 957, 959 (Tex.Civ.App.—Houston 1964, no writ).

■ Dr. Janes alleged that there was an agreement between the attorneys representing him and Halifax that Halifax would not foreclose under the deed of trust until the procuring of a warranty deed and corporate resolution from CPR Division satis-

factory to the title company, so as to permit the closing of an agreed-upon renewal and extension of the promissory note. Dr. Janes alleged that he had been lulled into a sense of security by this agreement, that he had no notice of the substitute trustee's sale of the 2.34 acre tract, and that "if he had had notice he would have taken steps to enjoin said sale pending the consummation of the transaction hereinbefore described or any other steps necessary to protect his interest prior to said sale." He prayed that he be awarded "his damage as prayed for herein, including interest and costs of court and for such other relief to which he may show himself as to be justly entitled." In paragraph three of his petition Dr. Janes asserted a cause of action against Halifax, Olivere and Grantwood Realty based on fraud. In this paragraph he alleged that the original sale of the property should be set aside and his consideration returned. In the alternative he asserted that the true value of the property was less than he had contracted to pay and then alleged: "Plaintiff would show that by reason of the facts herein above stated he should recover said damages, as well as other damages he may show himself justly entitled to herein from Defendants Olivere, Grantwood Realty and Halifax Corporation." Dr. Janes did not allege that the sum of $10,000, the price bid at the trustee sale, was grossly inadequate. He did not allege a specific sum as being the market value of the property on the date of the foreclosure sale so that a conclusion could be drawn that he was alleging a grossly inadequate consideration. Dr. Janes did not allege that by reason of the unauthorized sale title to the land in question passed into the hands of a third party or that by reason of the sale there had been a material interference with his dominion over the property, thus the necessary elements of a cause of action for damages for wrongful foreclosure were not properly alleged. The facts alleged are sufficient to assert a cause of action based on wrongful foreclosure to set aside the sale, but no point of error based on denial of this relief is presented.

The case of *John Hancock Mutual Life Insurance Co. v. Howard*, 85 S.W.2d 986 (Tex.Civ.App.—Waco 1935, writ ref'd) established that a temporary waiver by a mortgagee of its right to sell property under a deed of trust requires no consideration. This case further held that damages were not a proper remedy in the case of an illegal trustee's sale unless title to the property has, by means of the illegal sale, passed into the hands of a third party or has resulted in an unlawful interference with the mortgagee's possession of the land. The court held that the proper remedy in such a case would be to set aside the trustee's deed and to restore the mortagor's title, subject to the mortgagee's right to establish its debt and foreclose its lien.

■ In *Tarrant Savings Association v. Lucky Homes, Inc.*, 390 S.W.2d 473 (Tex. 1965), the Supreme Court approved the rule stated in these words:

> [I]f the sale is valid the mortgagee is entitled to judgment for the amount of the note, interest and attorney's fees, less the amount received at the trustee sale and other legitimate credits. If the sale is invalid and title to the property has passed to a third person or the property has been appropriated to the use and benefit of the mortgagee, the mortgagor is entitled to have the reasonable market value of the property credited on the note. . . .

Id. at 475.

The court also approved the rule as stated in the *Howard* case.

The trial court should not hesitate to grant a trial amendment when a defendant fails to show that he will be prejudiced. However, where, as in this case, the refusal of the trial amendment does not materially affect the rights of the parties proposing it, the trial court's action in refusing to grant the trial amendment is harmless error. Tex.R.Civ.P. 434.

■ Dr. Janes has also complained that the trial court erred in directing the jury to return a verdict in favor of Halifax Corporation and against him for the amount due

on the promissory note, less the $10,000 received at the trustee's sale. The testimony at the trial raised an issue of fact as to whether or not there was an agreement to postpone any foreclosure under the deed of trust until such time as the title company's objection to the deed furnished by the CPR Division could be met. Dr. Janes requested a special issue on wrongful foreclosure which the trial court refused. This was a material issue. A finding of wrongful foreclosure would have defeated the cause of action for a deficiency judgment asserted by Halifax Corporation. *Tarrant Savings Association v. Lucky Homes, Inc.*, supra. The trial court erred in directing a verdict for the Halifax Corporation requiring the deficiency judgment against Dr. Janes.

### CPR Division of the Upjohn Corporation

Dr. Janes' cause of action against the CPR Division of the Upjohn Company is based upon an alleged contract between Mr. Olivere and CPR whereby CPR agreed to convey to Olivere and Janes all of their interests in the 2.34 acre tract of land located in Brazoria County. He asserts that he was a third party beneficiary of this contract and that by reason of CPR's failure, or refusal, to furnish a deed conveying its interests in the land to them they were unable to perform their obligation to furnish a title guaranty policy under the contract with the Halifax Corporation, and that by reason of the failure to consummate the refinancing arrangement he was damaged in the sum of $50,000. As a part of its defense CPR Division asserted the statute of frauds.

■ The Statute of Frauds, Tex.Bus. & Comm.Code Ann. § 26.01, (Vernon Supp. 1980) bars the enforcement of an oral agreement to convey land unless the agreement, or a memorandum of it, is in writing and signed by the person to be charged or by someone lawfully authorized to sign for him. A written contract for the sale of realty is void under the Statute of Frauds if it does not describe the land in such a way as to identify it with reasonable certainty. *Smith v. Sorelle*, 126 Tex. 353, 87 S.W.2d

703 (1935). Dr. Janes contends that there is in evidence in this case of a sufficient written memorandum. This memorandum is a letter written by the attorney for CPR Division to Stewart Title Guaranty Company. The letter begins:

Reference is made to a Special Warranty Deed from CPR Division, The Upjohn Company, to O. Gaynor Janes and Richard Olivere, said deed having been executed by W. J. MacGregor of CPR Division, the Upjohn Company, and conveying 2.34 acres of land, more or less, located in Brazoria County, Texas.

This letter goes on to state that the CPR Division will agree to make certain changes in the wording of the deed and concludes:

We have been advised by Mr. W. J. MacGregor, Credit Manager of CPR Division, that it will be necessary to forward the Certificate of Resolution to the corporate offices of The Upjohn Company in Kalamazoo, Michigan for certification, in that Mr. MacGregor is reluctant to take this step for a $750 transaction. If a resolution is absolutely necessary, please advise so that we may obtain the same.

■ It is obvious from the language of the letter that a reference is made to an existing instrument which might furnish a description of the land referred to in the letter. In the file of the Brazoria County Abstract Company which was introduced into evidence as a whole there is an instrument providing that the CPR Division of the Upjohn Company would convey a specifically described 2.34 acre tract of land in Brazoria County, Texas, to O. Gaynor Janes and Richard Olivere. This instrument, however, is not signed by W. J. MacGregor or any one else. The instrument referred to in the letter was not introduced into evidence. It cannot be determined from the evidence introduced in this record whether or not the deed executed by W. J. MacGregor properly described the land to be conveyed. The memorandum relied upon by Dr. Janes fails to contain the essential terms of the contract with such certainty and clarity that it may be understood without recourse to parol evidence and, in

particular, fails to identify the property to be conveyed with sufficient certainty. Since the evidence fails to show a contract to convey sufficient to satisfy the requirement of the Statute of Frauds recovery is precluded both for specific performance and also for damages for the breach thereof. *Wilson v. Fisher*, 144 Tex. 53, 188 S.W.2d 150 (1945); *Boddy v. Gray*, 497 S.W.2d 600 (Tex.Civ.App.—Amarillo 1973, writ ref'd); *Wild v. Hargrave*, 565 S.W.2d 558 (Tex.Civ.App.—San Antonio 1978, writ dism'd).

### Richard Olivere

Dr. Janes asserts that the trial court erred in granting a directed verdict to defendant Richard Olivere. He asserts that the evidence raises a fact issue as to whether Olivere violated his fiduciary relationship by failing to disclose that the tract of land in question had recently been purchased by Howard Bannister from the Jamaica Corporation at a price substantially less than it was being offered to him.

■ A broker is a fiduciary required to exercise fidelity in good faith toward his principal in all matters within the scope of his employment. He cannot put himself in a position antagonistic to his principal's interest. This requirement not only forbids conduct on the part of the broker which is fraudulent or adverse to his client's interest, but also imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage. *Barnsdall Oil Co. v. Willis*, 152 F.2d 824 (5th Cir. 1946).

■ A real estate broker usually is understood to be one who is engaged by others on a commission basis to negotiate contracts relating to property. He is recognized as an agent employed to make or negotiate bargains or contracts for the sale or lease of real estate or other property between other persons and for which he is paid a commission. The commission is usually paid by the seller and the broker generally is recognized as the latter's agent. *Burleson v. Earnest*, 153 S.W.2d 869 (Tex.Civ.App.—Amarillo 1941, writ ref'd w. o. m.); *L. B. Menefee*

*Lumber Co. v. Davis-Johnson Lumber Co.*, 13 S.W.2d 962 (Tex.Civ.App.—Beaumont 1929, no writ).

■ In order to sustain his cause of action against Mr. Olivere, Dr. Janes had the burden of proving that a contract of agency existed between him and Mr. Olivere. Proof that the relationship of principal and agent existed can be made by circumstantial evidence. *Grundmeyer v. McFadin*, 537 S.W.2d 764 (Tex.Civ.App.—Tyler 1976, writ ref'd n. r. e.).

■ There must be consideration, mutuality and a meeting of the minds as to essential matters. The contract may arise by the principal's subsequent ratification of the broker's unauthorized acts. 12 Am. Jur.2d, Brokers, § 31, (1964). There was testimony that Mr. McKennery came to see Mr. Olivere and said that he had investors that were looking for investments and asked "did I have any." Dr. Janes testified that Mr. McKennery told him "that he had a deal that was good as a good investment." He stated that he went through Mr. McKennery but that Mr. McKennery did not put him in touch with anyone else and that he did not deal with anyone else in relation to the original purchase of this land. There is no testimony, direct or circumstantial, that there was a principal-agent relationship between Dr. Janes and Mr. Olivere.

Dr. Janes asserts, however, that the course of dealings between McKennery and Mr. Olivere created the relationship of agent and subagent. In *Gulf Refining Company v. Shirley*, 99 S.W.2d 613, 615 (Tex.Civ.App.—Eastland 1936, writ dism'd), the court quoted several definitions of the term "subagent" including:

A subagent is a person appointed by an agent to perform some duty, or the whole of the business relating to his agency. He may be the agent of the agent, or he may be the agent of the principal depending upon the agreement creating the primary agency, or upon the circumstances.

In the *Shirley* case the court pointed out that a "subagent" may sustain no contrac-

tual relation to the principal. And also stated that the authority of an agent to appoint a subagent must be proved. The burden of proof falling, of course, on the party alleging such authority. The Doctor testified that he had no agreement with Mr. McKennery about "who was going to get the land and how much ... land was going to be gotten ..., what the value of it was." There is no evidence that McKennery was authorized to employ Olivere to purchase land for Dr. Janes or to negotiate for the purchase of land on behalf of Dr. Janes.

 Mr. Olivere was a licensed real estate broker. Since 1939, the law of Texas has required a written contract before any person could enforce the payment of compensation for services rendered in connection with the sale or purchase of real estate in the courts of this State. The law also authorized the suspension of the license of a real estate dealer where, in any transaction involving the sale of an interest in real estate, he is guilty of acting for more than one party in a transaction without the knowledge or consent of all parties thereto. Tex.Rev.Civ.Stat.Ann. art. 6573a, (Vernon). There is evidence that Mr. Olivere acted as agent for Mr. Bannister in the sale of the real estate involved here. Mr. McKennery was not called to testify in this case and the only evidence relating to the transaction is that given by Mr. Olivere. There is insufficient evidence to raise an issue of fact as to whether Mr. McKennery was authorized by Dr. Janes to employ a subagent. In short, the evidence does not raise an issue of fact as to whether a principal-agent relationship existed between Dr. Janes and Mr. Olivere.

Dr. Janes also complains that the trial court erred in refusing certain special issues relating to the conduct of Mr. Olivere. Since the evidence does not establish a confidential relationship between Mr. Olivere and Dr. Janes, or raise an issue of fact with reference thereto, the special issues were properly refused.

The cause of action asserted by Halifax Corporation against Dr. Janes based on the asserted liability of Dr. Janes on the promissory note is severed, and the judgment with reference thereto is reversed and the cause is remanded to the trial court. In all other respects the judgment of the trial court is affirmed.